Rebecca A. Peterson (241858)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
rapeterson@locklaw.com

[additional counsel listed on signature page]

*Counsel for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO / OAKLAND DIVISION

| | |
|---|---|
| CRYSTAL CRAIG, TIFFANY BRYANT & SAIT KURMANGALIYEV,  Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR:**<br>1) **Breach of Contract;**<br>2) **Breach of the Covenants of Good Faith and Fair Dealing;**<br>3) **Intrusion Upon Seclusion;**<br>4) **Electronic Communications Privacy Act;**<br>5) **Federal Wiretap Act;**<br>6) **California Invasion of Privacy Act;**<br>7) **Negligent Misrepresentation;**<br>8) **Cal. Bus. & Prof. Code §§ 17200;**<br>9) **815 ILCS §§ 505;**<br>10) **815 ILCS §§ 510/2; and**<br>11) **N.Y. Gen. Bus. Law § 349**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

**INTRODUCTION**

1.     Plaintiffs Crystal Craig, Tiffany Bryant, and Sait Kurmangaliyev, on behalf of themselves and all others similarly situated, allege as follows upon personal knowledge as to their own conduct and on information and belief as to all other matters, based on investigation by counsel, such that each allegation has evidentiary support or is likely to have evidentiary support upon further investigation and discovery:

2.     Plaintiffs bring this action on behalf of themselves and millions of other Americans whose financial privacy has been violated by Facebook's Pixel tracking tool. As explained herein, Facebook knows (or should have known) that its Pixel tracking tool is being improperly used on the websites of financial services providers and online tax-filing services such as H&R Block ("Block"), TaxAct, and TaxSlayer, resulting in the wrongful, contemporaneous, re-direction to Facebook of sensitive financial communications and tax filer information. This unlawful transmission and collection of data is done without the knowledge or authorization of the customers, like Plaintiffs, in violation of Defendant's contracts with its users, as well as in violation of various federal and state laws.

3.     When a customer communicates with a financial services or tax filing provider's website and Facebook Pixel is present on the customer portal login page, the Facebook Pixel source code causes the exact content of the communication with their tax filing provider to be re-directed to Facebook in a fashion that identifies them as a tax filer and sends filers' tax-return data to Meta without their consent and in violation of federal law.

4.     Unbeknownst to Plaintiffs, and millions of other customers around the country, when they signed into an online tax or financial services provider, the Facebook Pixel secretly deployed on the webpage sent to Facebook the fact that they had clicked to sign-in to the portal. The data that the Facebook Pixel causes to be re-directed from the customer's computing device to Facebook includes tax filers' names, email addresses, adjusted gross incomes, tax-filing statuses, refund amounts, dependents' college scholarship amounts, dependents' names, and other information.  The Facebook Pixel also shares that the customer was communicating with a tax filing institution, the customer's Internet Protocol address, identifiers that Facebook uses to identify the

CLASS ACTION COMPLAINT

customer and his/her device, including cookies named c-user, datr, fr, and fbp (*i.e.* Facebook Pixel); and browser attribute information sufficient to fingerprint the customer's device. This information is collectively referred to as "sensitive financial information" throughout.

5.     The Facebook Pixel collected this information regardless of whether the filer had an account on Meta's social media platforms such as Facebook or Instagram, and regardless of whether the customer had agreed to share their information – in fact, even when filers expressly declined to share their information, the Facebook Pixel collected it anyway.

6.     As explained in further detail below, transmission of tax-filer data is a crime. 28 U.S.C. § 7216.   Disclosure of such information to third parties is permitted under specific circumstances, but only with valid consent.  Neither Facebook nor any of the financial services institutions that deployed the Facebook Pixel on their web properties ("Facebook Partner Financial Data Providers") procured valid authorizations for the disclosure of tax-return information to Facebook.

7.     In addition, in absence of authorization, Facebook's collection of sensitive financial information from Facebook Partner Financial Data Providers violates Defendant's privacy promises to users.  Facebook promises users that "publishers can send us information through Meta Business Tools [such as] the Meta Pixel" but Facebook "require[s] each of these partners to have lawful rights to collect, use, and share your data before providing any data to us."

8.     The Facebook Partner Financial Data Providers promise their customers/website users that they will protect the privacy of the taxpayer's sensitive financial information; that they will use and disclose their sensitive financial information only for enumerated, permitted purposes, and that they will obtain customer consent before disclosing their sensitive financial information for any non-enumerated purpose (Facebook Partner Financial Data Providers' Privacy Notices).[1] The Facebook Partner Financial Data Providers' Privacy Notices are substantively identical or very similar on these points, as they are largely dictated by law.

---

[1] *See, e.g.*, H&R Block Digital Privacy Notice, *available at* https://www.hrblock.com/universal/digital-online-mobile-privacy-principles/ (last accessed Jan. 3, 2023).

CLASS ACTION COMPLAINT

9.      Despite knowingly receiving sensitive financial information from Facebook Partner Financial Data Providers, Facebook has not taken any action to enforce or validate its requirement that Facebook Partner Financial Data Providers obtain adequate consent from taxpayers before providing taxpayer data to Facebook.

10.     Despite knowingly conveying sensitive financial information to Facebook via the Facebook Pixel, the Facebook Partner Financial Data Providers have not obtained adequate consent from customers before providing taxpayer data to Facebook.

11.     Facebook monetizes the information it receives through the Facebook Pixel deployed on tax filing servicers' web properties by using it to generate highly profitable targeted advertising on- and off-Facebook.

12.     The targeted advertising Facebook offers for sale includes the ability to target customers based on specific actions that a customer has taken on the Facebook Partner Financial Data Providers' websites and on confidential information about the customers at issue.

13.     Facebook also offers the ability to engage in remarketing based on positive targeting – that is, serving specific ad campaigns to customers based on the specific actions those customers took on the Facebook Partner Financial Data Providers' websites. For example, Facebook could target ads to a customer who had (1) used a specific tax-filing website; and (2) searched for specific tax or deduction- based information.

14.     Facebook also offers Facebook Partner Financial Data Providers the ability to engage in remarketing based on negative targeting – that is, ensuring that ads are not shown to users who have taken specific actions. This could mean that Facebook would exclude existing customers from a Facebook Partner Financial Data Provider's advertising campaign to specifically search for new customers.

15.     Facebook employs thousands of account managers or representatives to help partners, including Facebook Partner Financial Data Providers, use the Facebook Pixel and other tools.

16.     Through its account managers and representatives, Facebook is aware that it is receiving tax filer and sensitive financial information from many different Facebook Partner

Financial Data Providers in the United States without customer knowledge, consent, or authorization.

17.     Facebook also utilizes "The Facebook Crawler" that scans pages of partner apps and websites and through which Facebook gathers information about the app or website, including its title and description.  Through the Facebook Crawler, Facebook is aware that it is receiving sensitive financial information.

18.     Facebook is also aware of every web property where the Facebook Pixel is deployed and Facebook is fully capable of conducting expert analysis to identify tax filer websites or other financial services properties where the Facebook Pixel is present.

19.     Facebook's actions described herein give rise to causes of action for: (1) breach of contract; (2) breach of the duty of good faith and fair dealing; (3) intrusion upon seclusion / violation of Article I, section 1 of the California Constitution; (4) federal and state electronic communications privacy and wiretap claims; (5) violation of the California Invasion of Privacy Act, Cal. Penal Code §§ 631 and 632; (6) Negligent Misrepresentation; (7) Violation of California's Unfair Competition Law, (8) Violation of the Illinois Consumer Fraud Act; (9) Violation of the Illinois Uniform Deceptive Trade Practices Act; and (10) violation of the New York General Business Law ("GBL") § 349.

## **PARTIES**

20.     Plaintiff Crystal Craig is a citizen and resident of the State of Illinois.  Plaintiff used Block's online tax filing service after 2018, including in 2019.  Plaintiff was also a Facebook user while using Block's online tax filing services. Plaintiff's use of Block's online tax filing services included the time during which the Facebook Pixel was secretly deployed and collecting sensitive financial information.

21.     Plaintiff Tiffany Bryant is a citizen and resident of the State of Illinois.  Plaintiff used Block's online tax filing service after 2018, including in 2019.  Plaintiff was also a Facebook user while using Block's online tax filing services.  Plaintiff's use of Block's online tax filing

services included the time during which the Facebook Pixel was secretly deployed and collecting sensitive financial information.

22.     Plaintiff Sait Kurmangaliyev is a citizen and resident of the State of New York. Plaintiff used Block's online tax filing service after 2018, including in 2019. Plaintiff was also a Facebook user while using Block's online tax filing services.  Plaintiff's use of Block's online tax filing services included the time during which the Facebook Pixel was secretly deployed and collecting sensitive financial information.

23.     Defendant Meta Platforms, Inc. (referred to herein by its previous name of "Facebook") is a publicly traded Delaware corporation headquartered in Menlo Park, California, and does business throughout the United States and the world, deriving substantial revenue from interstate commerce.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises in part under 18 U.S.C. § 2510, *et seq.*, (the Electronic Communications Privacy Act). This Court further has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) (the Class Action Fairness Act) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and a member of the Class is a citizen of a State different from any Defendant.

25.     This Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

26.     This Court has personal jurisdiction over the Defendant because Defendant Facebook resides in this District and has sufficient minimum contacts with this District in that it operates and markets its services throughout the country and in this District.

27.     Venue is proper in this district because Defendant Facebook is headquartered in this District and resides this this District, and substantial parts of the events or omissions giving rise to the claims occurred in or emanated from this District.  Facebook developed the Pixel from its headquarters in Menlo Park and continues to operate the Pixel from that location.

28.     For the same reasons, divisional assignment to the San Francisco and Oakland division is appropriate pursuant to Civil L.R. 3-2(c).  Facebook's Menlo Park headquarters sits in San Mateo County, which is encompassed by that division.

## FACTUAL BACKGROUND

### Disclosure of Tax-Return Information in the United States

29.     Sensitive financial information in the form of tax-return information is federally protected in the United States by federal law and its implementing regulations. Specifically, it is a crime for any business that "prepar[es], or provid[es] services in connection with the preparation of" federal tax returns to "disclose any information furnished to him for, or in connection with, the preparation of any such return," or to "use[] any such information for any purpose other than to prepare, or assist in preparing, any such return." 28 U.S.C. § 7216.  For purposes of this provision, "tax return information means any information, including, but not limited to, a taxpayer's name, address or identifying number, which is furnished in any form or manner for, or in connection with, the preparation of a tax return of the taxpayer." 26 C.F.R. § 301.7216-1(b)(3).

30.     Under these implementing regulations, online tax-filing providers such as the Facebook Partner Financial Data Providers may not disclose tax-return information without consent.  The standards for obtaining valid consent are detailed at length in the applicable regulations. Substantively, the consent must "specify the tax return information to be disclosed or used by the return preparer," "describe the particular use authorized," and "identify the specific recipient (or recipients) of the tax return information." 26 C.F.R. § 301-7216-3(a)(3)(B). Procedurally, the consent must be "knowing and voluntary" (26 C.F.R. § 301-7216-3(a)(1)) and "signed and dated by the taxpayer" (26 C.F.R. § 301-7216-3(a)(3)(E)).

31.     In addition, "conditioning the provision of any services on the taxpayer's furnishing consent will make the consent involuntary," and thus "the consent will not satisfy the requirements" of the regulations. 26 C.F.R. § 301-7216-3(a)(1).  Consent also cannot be retroactive: "A taxpayer must provide written consent before a tax return preparer discloses or uses the taxpayer's tax return information." 26 C.F.R. § 301-7216-3(b).

32.     There are some circumstances in which a tax preparer may disclose tax return information *without* filers' consent, such as disclosure in response to a subpoena or other lawful process. *See* 26 C.F.R. § 301.7216-2. No such exception is relevant in the instant case.

33.     The prohibition on disclosure of tax-return information applies to all Facebook Partner Financial Data Providers. Each of these businesses is "engaged in the business of preparing, or providing services in connection with the preparation of, returns of the tax imposed by [the Internal Revenue Code]." 28 U.S.C. § 7216.  TaxAct admits this in its Privacy Policy, where it notes that: "[t]he use and disclosure of Tax Return Information is governed by Section 301-7216 of the Internal Revenue Code." Similarly, TaxSlayer's Privacy Policy notes that "Section 301-7216 of the Internal Revenue Code specifically governs the use and disclosure of Tax Return Information."

34.     There is no exception in the laws or regulations enumerated above for the Internet or online taxation service portals.

**Facebook's Contractual Promises**

35.     Facebook is an American multinational technology company. It owns and operates several of the most popular social media and technology products in the world—including Facebook, Instagram, and WhatsApp.  Facebook itself is the world's largest social media company.

36.     Like most social-media companies, Facebook does not, in general, charge consumers to use its platforms. Meta makes its money, instead, by selling advertising space to third parties. These advertisers pay for the privilege of putting their notices in front of the billions of consumers who use Facebook's products. In 2021, Facebook had nearly $115 billion in advertising revenue—97.5% of its total revenue.[2]

37.     Giving advertisers more and more effective means of targeting potential customers is central to Facebook's business and profitability. From the time Mark Zuckerberg announced Facebook Ads in 2007, the main selling point of social media advertising—as opposed to

---

[2] Securities and Exchange Commission, Form 10-K for Meta Platforms, Inc. at 93 (2021), *available at* https://www.sec.gov/Archives/edgar/data/1326801/000132680122000018/fb-20211231.htm (last accessed Jan. 3, 2023).

CLASS ACTION COMPLAINT

traditional mediums—was the ability to customize, micro-target, and monitor advertising campaigns. The entire purpose of Facebook Ads is to give advertisers access to data on users' Facebook activity, demographics, and interests. Over time, as competing social media platforms have emerged, Facebook has developed more and more sophisticated tools to enhance its advertising.  The Facebook Pixel is the current iteration.

38.     Every Facebook user is legally deemed to have agreed to the Terms, Data Policy, and Cookie Policy via a checkbox on the sign-up page; and the Terms, Data Policy, and Cookie Policy are binding upon Facebook and its users.

39.     The Facebook Data Policy expressly provides that Facebook "requires" businesses that use the Facebook Pixel "to have lawful rights to collect, use, and share your data before providing any data to [Facebook]." Facebook further claims that "[i]t is against Facebook's policies for websites and apps to send sensitive information about people through our Business Tools," and that Facebook's "system is designed to filter out potentially sensitive data it detects."

40.     But Facebook does not "require" financial services providers to have lawful rights to share tax data associated with their respective websites and online portals before sending it to Facebook.

41.     Instead, Facebook merely includes a provision in its form contract which creates an unenforced "honor system" for publishers, stating that, by using the Facebook Business Tools, the publisher "represent[s] and warrant[s] that [it has] provided robust and sufficient prominent notice to users regarding the Business Tool Data collection, sharing, and usage."

42.     In reality, Facebook does not actually verify that publishers have obtained adequate consent per the contract.[3]

43.     Instead, the Facebook Pixel is blindly made available to any willing publisher regardless of their privacy policies, consent processes, or the nature of their business.  Facebook also does not effectively filter the sensitive data it receives.  Instead, Facebook routinely collects,

---

[3] In contrast, Facebook requires publishers in the European Union to provide "all necessary consents" in a "verifiable manner."

stores, and uses consumers' sensitive financial information without appropriate consent and, at times, in violation of state and federal laws and regulations.

44.     Facebook's contract with tax preparers and online financial services providers governing use of the Facebook Pixel does not mention federal laws related to sharing of tax return information at all.

45.     Facebook does not take any action to discourage financial services providers from using the Facebook Pixel. In fact, Facebook actively encourages financial services providers and online tax preparers to use the Facebook Pixel for their marketing campaigns.

### How The Facebook Pixel Works

46.     As part of its business, Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications that Facebook associates with personal identifiers including IP addresses, cookies, and device identifiers.

47.     Facebook also tracks non-users across the web through its widespread Internet marketing products and source code.

48.     Facebook's revenue is derived almost entirely from selling targeted advertising to Facebook users on Facebook.com and to all Internet users on non-Facebook sites that integrate Facebook marketing source code on their websites.

49.     Facebook Business is the division that provides advertising services to developers. Facebook Business and the advertising tools it provides to developers are focused on trade and commerce.

50.     The Facebook Pixel, a product for Facebook Business, is a "piece of code" that lets developers "measure, optimize and build audiences for ... ad campaigns."[4]  It was introduced in 2015 and is enormously popular: at least six million distinct websites use the Pixel, including 30% of the world's 100,000 most visited websites.

51.     The Facebook Pixel is an invisible 1x1 web bug that Facebook makes available to web-developers to help track ad-driven activity from Facebook and others on their website.

---

[4] https://www.facebook.com/business/learn/facebook-ads-pixel

CLASS ACTION COMPLAINT

Facebook markets the Pixel as a way to "make sure . . . ads are shown to the right people," improve user experience, target advertisements, and drive sales.  The Facebook Pixel is provided free of charge to third-party advertisers.

52.    Key features of the Facebook Pixel include its ability to help developers:

a.   "Measure cross-device conversions" and "understand how your cross-device ads help influence conversion";

b.   "Optimize delivery to people likely to take action" and "ensure your ads are shown to the people most likely to take action"; and

c.   "Create custom audience from website visitors" and create "dynamic ads [to] help you automatically show website visitors the products they viewed on your website – or related ones."

d.   Facebook describes the Facebook Pixel as "a snippet of Javascript code" that "relies on Facebook cookies, which enable [Facebook] to match ... website visitors to their respective Facebook User accounts."

53.    Facebook further explains "How the Facebook Pixel Works": "When someone visits your website and takes an action (for example, buying something), the Facebook pixel is triggered and reports this action.  This way, you'll know when a customer took an action after seeing your Facebook ad. You'll also be able to reach this customer again by using a custom audience.  When more and more conversions happen on your website, Facebook gets better at delivering your ads to people who are more likely to take certain actions.  This is called conversion optimization." [5]

54.    Facebook provides simple instructions for developers about "Setting up the Facebook Pixel":

a.   "If you have access to your website's code, you can add the Facebook pixel yourself.  Simply place the Facebook pixel base code (what you see when you create your pixel) on all pages of your website.  Then add standard events to the pixel code on all special pages of your website, such as your add-to-

---

[5] *Id.*

CLASS ACTION COMPLAINT

cart page or your purchase page.  For full step-by-step instructions or adding the Facebook pixel to your site, visit the Help Center."[6]

    b.  "Many people need the help of a developer to complete this step.  If that's the case, simply email your Facebook pixel code to them, and they can easily add it to your site."

    c.  "Create your Facebook pixel to send to your developer, or install it yourself."

    d.  "Go to Ads Manager"[7]

55.    Facebook creates the Facebook code for each developer who installs it.

56.    Facebook recommends that the Pixel code be placed early in the source code for any given webpage or website to ensure that the user will be tracked:

Installing The Pixel

To install the pixel, we highly recommend that you add its base code between the opening and closing <head> tags on every page where you will be tracking website visitor actions. Most developers add it to their website's persistent header, so it can be used on all pages.

Placing the code within your <head> tags reduces the chances of browsers or third-party code blocking the pixel's execution. It also executes the code sooner, increasing the chance that your visitors are tracked before they leave your page.[8]

57.    By executing the code sooner, Facebook has designed the Pixel such that Facebook receives the information about taxpayers' actions on the online taxation services' portals/Internet sites contemporaneous with their making.

58.    As soon as a customer takes any action on a webpage which includes the Facebook Pixel—such as clicking a button to register, login, or logout of an online portal or input information—Facebook's source code commands the customer's computing device to re-direct the content of the customer's communication to Facebook while the exchange of the communication between the customer and the financial services provider is still occurring.

---

[6] *Id.*
[7] *Id.*
[8] *Id.*

CLASS ACTION COMPLAINT

59.     By design, Facebook receives the content of a customer's online portal or website communication immediately *after* the customer clicks the log-in button and *before* the financial services provider receives it.

60.     The cookies by which Facebook identifies customers include, but are not necessarily limited to, cookies named: c_user, datr, fr, and _fbp.

61.     The c_user cookie is a means of identification for Facebook users. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user account has one – and only one – unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

62.     A skilled computer user can obtain the c_user cookie value for any Facebook user by (1) going to the user's Facebook page, (2) right-clicking on their mouse, (3) selecting 'View page source,' (4) executing a control-F function for "fb://profile," and (5) copying the number value that appears after "fb://profile" in the page source code of the target Facebook user's page.

63.     It is even easier to find the Facebook account associated with a c_user cookie: one simply needs to log-in to Facebook, and then type www.facebook.com/#, with # representing the c_user cookie identifier. For example, the c_user cookie value for Mark Zuckerberg is 4. Logging in to Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

64.     The Facebook datr cookie identifies the customer's specific web browser from which the customer is sending the communication. It is an identifier that is unique to the customer's specific web browser and is therefore a means of identification for Facebook users.

65.     Facebook keeps a record of every datr cookie identifier associated with each of its users, and a Facebook user can obtain a redacted list of all datr cookies associated with his or her Facebook account from Facebook.

66.     Any Facebook user can view the specific datr cookie identifiers that Facebook has associated with their account by using the Facebook Download Your Information tool.

67.     The Facebook fr cookie is an encrypted combination of the c_user and datr cookies.[9]

68.     The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with Defendant's use of the Facebook Pixel. The _fbp cookie is a Facebook cookie that masquerades as a first-party cookie to evade third party cookie blockers and share data more directly between financial services providers and Facebook.

69.     Facebook Partner Financial Data Providers or their developers then simply copy-paste the Facebook Pixel code that Facebook creates and provides into the Facebook Partner Financial Data Providers' web-property.

70.     Facebook expressly admits that the Pixel "log[s] when someone takes an action" such as "adding an item to their shopping cart or making a purchase":

> Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website. Examples of actions include adding an item to their shopping cart or making a purchase. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take. You'll also have options to reach those customers again through future Facebook ads.

71.     The organizational system described above relies on subjects' pre-existing Facebook-platform accounts (*e.g.*, a Facebook or Instagram profile). But when a data-collection subject lacks an account on any of Facebook's platforms, the Facebook Pixel logs their activities and sends the data to Facebook anyway. The dossiers Facebook compiles on these persons are known as "shadow profiles." When asked by Congress about these shadow profiles, Mark Zuckerberg responded: "[W]e collect data on people who have not signed up for Facebook for security purposes." Facebook has not otherwise publicly revealed how it organizes and uses information about non-users.

---

[9] *See* Facebook Tracking Through Social Plug-ins: Technical Report prepared for the Belgian Privacy Commission, Mar. 27, 2015, *available at* https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_pluginsv1.0.pdf.

CLASS ACTION COMPLAINT

**Facebook Changed its Contractual Privacy Promises in 2018**

72.    Prior to April 2018, Facebook's contract did not "require" partners to have the lawful rights to share user data before doing so.

73.    Upon information and belief, Facebook changed its contract with users on or about April 19, 2018, which added a clause stating: "We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us."

74.    The following is a side-by-side comparison of the pre- and post-April 2018 contract provisions:

| Before April 19, 2018 | After April 19, 2018 |
|---|---|
| **Information from websites and apps that use our Services.** We collect information when you visit or use third-party websites and apps that use our Services (like when they offer our Like button or Facebook Log In or use our measurement and advertising services). This includes information about the websites and apps you visit, your use of our Services on those websites and apps, as well as information the developer or publisher of the app or website provides to you or us. **Information from third-party partners.** We receive information about you and your activities on and off Facebook from third-party partners, such as information from a partner when we jointly offer services or from an advertiser about your experiences or interactions with them. | **Information from partners.** Advertisers, app developers, and publishers can send us information through Meta Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel. These partners provide information about your activities off of our Products—including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services—whether or not you have an account or are logged into our Products. For example, a game developer could use our API to tell us what games you play, or a business could tell us about a purchase you made in its store. We also receive information about your online and offline actions and purchases from third-party data providers who have the rights to provide us with your information. Partners receive your data when you visit or use their services or through third parties they work with. We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us. Learn more about the types of partners we receive data from. |

CLASS ACTION COMPLAINT

| Before April 19, 2018 | After April 19, 2018 |
|---|---|
|  | To learn more about how we use cookies in connection with Meta Business Tools, review the <u>Facebook Cookies Policy</u> and <u>Instagram Cookies Policy</u>. |

**Facebook Partner Financial Data Providers' Contractual Promises**

75.    The Facebook Partner Financial Data Providers make substantively identical or extremely similar promises in their Privacy Notices, including promises that they will protect the privacy of their customers' sensitive financial and tax information; that they will use and disclose sensitive financial and tax information only for enumerated, permitted purposes, and that they will obtain the taxpayers' consent before disclosing sensitive financial and tax for any non-enumerated purpose.

76.    Each Facebook Partner Financial Data Provider has adopted a Privacy Policy that details its data-usage practices. These policies purport to be valid consents for at least some disclosures and uses of filers' data. However, none of these purported consents are valid for the purpose of authorizing transmission of Plaintiffs or the class's tax-return information to Facebook via the Facebook Pixel tool.

77.    First, each Facebook Partner Financial Data Provider Defendant required users to agree to its terms of use and privacy policy as a condition of signing up for their online tax-preparation services. Two of the services—H&R Block and TaxAct—required users to click a checkbox indicating their consent to these agreements before signing up. The third, TaxSlayer, noted that users would be deemed to agree to its privacy policy and license agreement simply by clicking "Create Account." Users cannot access any of the Tax-Filing Services online offerings without agreeing to these purported consents. At the same time, none of the three businesses required users to open their privacy policies or terms of use or sign and date them. In fact, none of the Facebook Partner Financial Data Providers terms of use or privacy policies contained spaces for dates or signatures.

78.     None of the Facebook Partner Financial Data Providers' privacy policies or websites required users to open their terms and conditions or privacy policies— much less sign and/or date them. Further, none of the terms and conditions or privacy policies contained signature or date blocks.

79.     In addition, none of the Facebook Partner Financial Data Providers' purported consents mention the Facebook Pixel as an entity to which they would be providing tax information or otherwise specify the information they provided to Facebook.   .

**Regulatory and Journalistic Investigations Reveal Facebook Practices and Procedures Regarding Sensitive Financial Information**

80.     Facebook is currently part of several ongoing and past regulatory and journalistic investigations into its use of sensitive financial information and tax return information.  For example, the Governor of New York ordered the New York State Department of Financial Services ("NYDFS") to undertake an investigation, which issued a final report in February 2021.[10]  In that report, NYDFS acknowledged that Facebook's Business Tools Terms prohibited app developers and other third parties from sending Facebook certain data, including sensitive financial data. These Terms provide that "You [*i.e.*, the developer] will not share Customer Data with us that you know or reasonably should know ... includes health, financial information, or other categories of sensitive information (including any information defined as sensitive under applicable law)." Nevertheless, during NYDFS's investigation, Facebook's representatives admitted that the company "routinely obtained sensitive data from app developers" in violation of its own policies.

81.     The NYDFS Final Report went on to conclude the following:

         a.   "[N]otwithstanding Facebook's policy that app developers should not
              transmit sensitive data to Facebook, there were many examples where the

---

[10] New York Dep't of Financial Services, *Report on Investigation of Facebook Inc. Data Privacy Concerns* (2021), *available at* https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf (last accessed Jan. 3, 2023).

CLASS ACTION COMPLAINT

developers violated that policy and Facebook did indeed—unwittingly, it contends—receive, store, and analyze sensitive data."

b.  "The information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective at enforcing Facebook's policy or preventing the receipt of sensitive data."

c.  "Facebook has repeatedly rebuffed NYDFS's efforts to obtain information that would have provided more fulsome transparency with respect to the scope and scale of the problem. Though Facebook acknowledges the problem—i.e., that in the past it did receive sensitive information from app developers contrary to its own policy—it has failed to provide sufficient detail about, among other things, specifically what kinds of sensitive information was obtained, how regularly it was received, or which app developers violated the rules by transmitting such information."

d.  "As noted, the sharing of sensitive user information by an app developer is a violation of Facebook Business Tools' terms of service. Merely stating a rule, however, has little meaning if the rule is not enforced, and the unfortunate fact is that Facebook does little to track whether app developers are violating this rule and takes no real action against developers that do."

e.  "The Department finds Facebook's efforts here seriously lacking and recommends it undertake significant additional steps to police its own rules. Even assuming a strong screening program on the back end, Facebook must take steps to determine whether app developers are transmitting sensitive data."

82.   In June 2022—nearly a year and a half after NYDFS issued its report—investigative journalists at The Markup revealed that the Facebook Pixel was installed on the patient portals and websites of dozens of the nation's top hospitals. Using a custom-built "Pixel inspector," these journalists showed that Meta was collecting patients' names, the dates and times of their medical appointments, and the names of their doctors. Meta is currently facing several class-action lawsuits

CLASS ACTION COMPLAINT

arising from this collection of patients' medical data, which allege that the collection of this information violated the Health Insurance Portability and Accountability Act ("HIPAA").[11]

83.     In April 2022, the online news outlet Motherboard published a leaked Facebook internal memorandum that revealed a much bleaker picture regarding the nature of Facebook's data-gathering operation.[12] There, Facebook engineers analyzed their company's "privacy infrastructure" and made recommendations for "long-range investments" to address mounting regulatory and legal scrutiny. They were shockingly direct. Their conclusions included:

a.  "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.' And yet, this is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation."

b.  "If we can't enumerate all the data we have—where it is; where it goes; how it's used—then how can we make commitments about it to the outside world?"

c.  "We've built systems with open borders. The result of these open systems and open culture is well described with an analogy: Imagine you hold a bottle of ink in your hand. This bottle of ink is a mixture of all kinds of user data (3PD [i.e., Third-Party Data], 1PD [i.e., First-Party Data], SCD [i.e., Sensitive Customer Data], Europe, etc.) You pour that ink into a lake of water (our open data systems; our open culture) ... and it flows ... everywhere. How do you put that ink back in the bottle? How do you organize it again, such that it only flows to the allowed places in the lake?"

---

[11] *See* The Markup, *Facebook is Receiving Sensitive Medical Information from Hospital Websites* (June 16, 2022), *available at* https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last accessed Jan. 3, 2023).

[12] *See* Lorenzo Franceschi-Biccherai (Motherboard), *ABP Privacy Infra, Long Range Investments* (2021), *available at* https://www.documentcloud.org/documents/21716382-facebook-data-lineage-internal-document (last accessed Jan. 3, 2023).

CLASS ACTION COMPLAINT

84.     In November 2022, The Markup published additional information regarding Facebook's data-gathering practices, specifically related to the tax and financial information shared.[13] "Major tax filing services such as H&R Block, TaxAct, and TaxSlayer have been quietly transmitting sensitive financial information to Facebook when Americans file their taxes," The Markup found, "including data on users' income, filing status, refund amounts, and dependents' college scholarship amounts." More than 150 million Americans file individual tax returns electronically each year. The Markup's reporting revealed that Meta gathered financial information from tens of millions of those filers through the Pixel, embedded on tax-filing services' websites.

85.     For example, when users sign up for TaxAct, they are asked to provide information to calculate their returns—including how much money they make and the amount and nature of their investments. The Facebook Pixel on TaxAct's website sends that data to Facebook, including users' filing status, their adjusted gross income, and the amount of their tax refund. The Facebook Pixel also sent the names of filers' dependents in an obfuscated but reversible format. TaxAct has about three million annual users.

86.     Tax-preparation heavyweight H&R Block similarly offers its users an online filing option, with 6.7 million online filings in 2020. H&R Block embedded the Facebook Pixel on its site and gathered filers' health savings account usage and dependents' college tuition grants and expenses.

87.     TaxSlayer, another widely used filing service, also sent sensitive financial information to Facebook as part of Facebook's "advanced matching system," which gathers information on web visitors to link them to Facebook accounts. The information gathered through the Facebook Pixel on TaxSlayer's site included phone numbers, the name of the user filling out the form, and the names of any dependents added to the form. TaxSlayer users completed more than 10 million federal and state returns last year.

---

[13] *See* The Markup, *Tax Filing Websites Have Been Sending Users' Financial Information to Facebook* (Nov. 22, 2022), *available at* https://themarkup.org/pixel-hunt/2022/11/22/tax-filing-websites-have-been-sending-users-financial-information-to-facebook (last accessed Jan. 3, 2023).

CLASS ACTION COMPLAINT

88.     In addition, the Pixels embedded by TaxSlayer and TaxAct used the feature called "automatic advanced matching" that scans forms looking for fields that contain personally identifying information like phone numbers, first names, last names, or email addresses, and then sends the detected information to Meta. On TaxSlayer's site this feature collected phone numbers and the names of filers and their dependents. On TaxAct it collected the names of dependents.

## CLASS ACTION ALLEGATIONS

89.     Plaintiffs file this as a class action on behalf of themselves and the following nationwide class pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3):

> All Facebook users who are current or former customers of any financial services or tax-preparation software company in the United States with web properties through which Facebook acquired sensitive financial or tax information for which neither the financial services company nor Facebook obtained a valid consent.

90.     Where appropriate, the above-defined class is referred to as the "Class."

91.     Excluded from the Class are the Court and its personnel and Facebook and their officers, directors, employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity in which any of them have a controlling interest.

92.     Plaintiffs reserve the right to amend the class definitions, including creating subclasses as necessary, after having had an opportunity to conduct discovery.

93.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

94.     **Numerosity.** Consistent with Fed. R. Civ. P. 23(a)(1), the members of the Class are so numerous that joinder is impracticable.  While the exact number of Class Members is unknown to Plaintiffs at this time, the proposed Class includes at least tens of millions of individuals who may be identified through objective means.

95.     **Commonality and Predominance.** Consistent with Fed. R. Civ. P. 23(a)(2) and 23(b)(3), common questions of law and fact are apt to drive resolution of the case, exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class including, but not limited to, the following:

a. Whether the Facebook Pixel is designed to send individually identifiable information to Facebook;

b. Whether Facebook failed to require Facebook Partner Financial Data Providers to have lawful rights to share sensitive financial data with Facebook before deploying the Facebook Pixel;

c. Whether Facebook acquired sensitive financial data or tax record information;

d. Whether Plaintiffs and the Class provided authorization for Facebook to acquire their sensitive financial data or tax record information or communications with tax providers regarding the same;

e. Whether the Facebook Pixel's presence and use on Facebook Partner Financial Data Provider websites where it discloses actions that customers take relating to tax records and personal financial information to their Facebook Partner Financial Data Providers is highly offensive;

f. Whether the Pixel is designed to and in fact does send individually identifiable financial and personal tax-related information to Facebook;

g. Whether Facebook's acquisition of the content of communications between customers and their Facebook Partner Financial Data Providers occurred contemporaneous to their making;

h. Whether Facebook breached its contracts with users;

i. Whether the information at issue has economic value; and

j. Whether Defendant unjustly profited from their conveyance and collection of sensitive financial data and tax record information.

96. **Typicality.** Consistent with Fed. R. Civ. P. 23(a)(3), the named Plaintiffs' claims are typical of the claims of other Class Members, as all members of the Class were similarly affected by Defendant's wrongful conduct in violation of federal and state law, as complained of herein.

97. **Adequacy.** Consistent with Fed. R. Civ. P. 23(a)(4), the named Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel that is

competent and experienced in class action litigation. The named Plaintiffs have no interests that conflict with, or are otherwise antagonistic to, the interests of, other Class Members.

98.     **Superiority.** Consistent with Fed. R. Civ. P. 23(b)(3), a class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class Members is impracticable. Further, as the damages that individual Class Members have suffered may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in management of this action as a class action.

99.     Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3), because the common questions of law and fact predominate over any questions affecting individual Class Members, a class action is superior to other available methods for the fair and efficient adjudication of this controversy, and the requirements of Rule 23(a) are met.

## **TOLLING**

100.     Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Class were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

101.     Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Facebook was acting unlawfully and in the manner alleged herein. As alleged herein, the representations made by Defendant were material to Plaintiffs and members of the Class at all relevant times. Within the time- period of any applicable statutes of limitations, Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence the alleged wrongful conduct.

102.     At all times, Defendant is and was under a continuous duty to disclose to Plaintiffs and members of the Class the true nature of the disclosures being made and the lack of an actual "requirement" before the data was shared with Facebook.

103.     Defendant knowingly, actively, affirmatively and/or negligently concealed the facts alleged herein. Plaintiffs and members of the Class reasonably relied on Defendant's concealment.

104. For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**BREACH OF CONTRACT**

105. Plaintiffs hereby incorporate all prior paragraphs as if fully stated herein.

106. Facebook requires users to click a box indicating that, "By clicking Sign Up, you agree to our Terms, Data Policy and Cookies Policy."

107. "Click-wrap agreements" such as those at issue herein are valid and binding contracts.

108. The Facebook Terms are binding on Facebook and its users.

109. The Facebook Data Policy is binding on Facebook and its users.

110. The Facebook Cookies Policy is binding on Facebook and its users.

111. The Facebook Data Policy promises users that Facebook "requires each of [Facebook's] partners to have lawful rights to collect, use and share your data before providing any data to [Facebook]."

112. Facebook breached this contractual promise, as described in detail above, by not requiring its Facebook Partner Financial Data Providers to obtain consent before sharing sensitive financial information and/or tax records and other data relating to online portal registration, logins, and logouts with Facebook through the Facebook Pixel and through other means.

113. The Facebook Partner Financial Data Providers promise in their Privacy Policies that they will protect the privacy of Plaintiffs' sensitive financial information and/or tax records; that they will use and disclose this information only for enumerated, permitted purposes, and that they will obtain the customer's consent before disclosing their financial and/or tax record information for any non-enumerated purpose.

114.    The Facebook Partner Financial Data Providers breached these contractual promises when they conveyed sensitive financial information and/or tax record information to Facebook via the Facebook Pixel without obtaining their customers' consent.

115.    In addition to the express contract provisions set forth above, implied contracts existed between Defendant and Plaintiffs that Defendant would not conspire with others to violate Plaintiffs' legal rights to privacy in their individually identifiable sensitive financial information.

116.    Plaintiffs are Facebook account holders who used Facebook Partner Financial Data Providers' online portals and/or web-properties through which Facebook obtained their individually identifiable sensitive financial information.

117.    The user financial and personal information that Facebook obtained in breach of the contracts included tax filers' names, usernames, IP addresses, the devices they used, their incomes, their tax-filing status, the amount of their tax returns, their number of dependents, the names of their dependents, and the amount of their dependents' college scholarships (if any).

118.    Defendant's breaches caused Plaintiffs and Class Members the following damages: nominal damages for breach of contract; general damages for invasion of their privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm; sensitive and confidential information including financial and personal information that Plaintiffs and Class Members intended to remain private are no longer private; Defendant eroded the essential confidential nature of the filer-tax preparer relationship; Defendant took something of value from Plaintiffs and Class Members and derived benefits therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value; and, benefit of the bargain damages in that Defendant's contracts stated that payment for their services would consist of a more limited set of collection of personal information than that which Defendant actually charged.

## **SECOND CAUSE OF ACTION**

## **GOOD FAITH AND FAIR DEALING**

119.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

120.    A valid contract exists between Plaintiffs and Facebook.

CLASS ACTION COMPLAINT

121.    The contract specifies that California law governs the parties' relationship.

122.    Facebook prevented Plaintiffs and Class Members from receiving the full benefit of the contract by intercepting the content of protected individually identifiable financial and personal information exchanged with tax filing services and financial services providers.

123.    By doing so, Facebook abused its power to define terms of the contract, specifically the meaning of the term "require" in Facebook's promise that it would "require" partners to have lawful rights to share users' data with Facebook before doing so and then taking no action (and actually encouraging) financial providers to share protected financial and tax record information without valid authorization.

124.    By doing so, Facebook did not act fairly and in good faith.

125.    Facebook's breach caused Plaintiffs and Class Members the following damages: nominal damages for breach of contract; general damages for invasion of their privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm; sensitive and confidential information including financial and personal information that Plaintiffs and Class Members intended to remain private are no longer private; Facebook eroded the essential confidential nature of the filer-tax preparer relationship; Facebook took something of value from Plaintiffs and Class Members and derived benefits therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value; and, benefit of the bargain damages in that Facebook's contract stated that payment for its services would consist of a more limited set of collection of personal information than that which Facebook actually charged.

## THIRD CAUSE OF ACTION

## INTRUSION UPON SECLUSION—CONSTITUTIONAL INVASION OF PRIVACY

126.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

127.    Article I, section 1 of the California Constitution provides:

> *All people* are by nature free and independent and *have inalienable rights. Among these are* enjoying and defending life and liberty, acquiring, possessing, and protecting property, and *pursuing and obtaining* safety, happiness, and *privacy.*

Cal. Const. art. I, § 1 (emphasis added).

128.    Plaintiffs had no knowledge and did not consent or authorize Facebook Partner Financial Data Providers to convey or Defendant Facebook to obtain the content of their communications with their financial services or tax-service providers as described herein.

129.    Plaintiffs enjoyed objectively reasonable expectations of privacy surrounding communications with their Facebook Partner Financial Data Providers based on:

   a.   The tax-preparation providers' status as trusted recipients of their most sensitive financial and personal information;

   b.   The laws and regulations prohibiting disclosure of tax return information cited herein;

   c.   the Electronic Communications Privacy Act, and;

   d.   Facebook's promise that it would "require" partners to have lawful permission to share their data before Facebook would collect it.

130.    Plaintiffs' claims are based on the following private facts:

   a.   that Plaintiffs and the Class are customers of the various tax-preparation providers specified herein;

   b.   the specific dates and times Plaintiffs and the Class clicked to log-in or log-out of the various tax-preparation providers' user portals;

   c.   the specific and detailed communications exchanged while logged in the tax-preparation providers' user portals, and;

   d.   the specific dates and times when Plaintiffs and the Class submitted their taxes and information incorporated into those tax filings.

131.    Defendant's conduct was intentional and intruded on Plaintiffs' and Class Members' personal and financial communications which constitute private conversations, matters, and data.

132.    Defendant's conduct in acquiring and conveying financial and personal tax-related communications would be highly offensive to a reasonable person because:

    a.   Facebook conspired with Plaintiffs' and the Class members' tax-preparation service providers, including the Facebook Partner Financial Data Providers, to violate a cardinal rule of the filer-tax preparer relationship;

    b.   Defendant's conduct violated federal law designed to protect tax-preparation services' users' privacy;

    c.   Defendant's conduct violated the Electronic Communications Privacy Act;

    d.   Defendant's conduct violated the express promises it made to users.

133.    Defendant's breaches caused Plaintiffs and Class Members the following damages: nominal damages for breach of contract; general damages for invasion of their privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm; sensitive and confidential information including financial and personal information that Plaintiffs and Class Members intended to remain private are no longer private; Defendant eroded the essential confidential nature of the filer-tax preparer relationship; Defendant took something of value from Plaintiffs and Class Members and derived benefits therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value; and, benefit of the bargain damages in that Defendant's contracts stated that payment for their services would consist of a more limited set of collection of personal information than that which Defendant actually charged.

## FOURTH CAUSE OF ACTION

## VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT

134.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

135.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the contents of any electronic communication. 18 U.S.C. § 2511.

136.    The ECPA protects both the sending and receipt of communications.

137.    18 U.S.C. § 2520(a) provides a private right of action to any person whose electronic communications are intercepted.

138.    Facebook intentionally intercepted, and Facebook Partner Financial Data Providers sent to Facebook, the electronic communications that Plaintiffs exchanged with their respective

Facebook Partner Financial Data Providers on the providers' web properties where the Facebook Pixel was present.

139.    The transmissions of data between Plaintiffs and their financial services and tax preparer providers qualify as communications under the ECPA's definition in 18 U.S.C. § 2510(12).

140.    The Facebook Partner Financial Data Providers sent, and Defendant Facebook acquired, Plaintiffs' and Class Members' communications with their financial services and tax providers as alleged herein contemporaneous with their making.

141.    The intercepted communications include:

     a. the content of user registrations for various tax-preparation service portals, including clicks on buttons to "Register" or "Signup" for said portals;

     b. the contents of communications that users exchange with their tax-preparation providers inside various web portals immediately before logging out of those portals; and

     c. the contents of communications relating to users' financial and personal information provided for the purpose of preparing tax filings.

142.    The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

     a. The cookies Facebook used to track users' communications;

     b. The users' browsers;

     c. The users' computing devices;

     d. Facebook's web-servers;

     e. The web-servers of the Facebook Partner Financial Data Providers web properties where the Facebook Pixel was present; and

     f. The Facebook Pixel source code deployed by Defendant to effectuate the sending and acquisition of sensitive financial communications.

143.    Facebook is not a party to users' communications with their tax-preparation service providers.

144.    The Facebook Partner Financial Data Providers sent to Facebook, and Facebook received, the content of user communications through the surreptitious redirection of them from users' computing devices to Facebook.

145.    Users did not consent to the Facebook Partner Financial Data Providers sending, or to Facebook's acquisition of, their communications with their tax-preparation service providers and with the Facebook Partner Financial Data Providers.

146.    Neither Facebook nor the Facebook Partner Financial Data Providers obtained legal authorization to obtain or convey tax-related communications with tax-preparer or financial services providers related to tax filings or sensitive financial information.

147.    Facebook did not require any Facebook Partner Financial Data Providers to obtain, and the Facebook Partner Financial Data Providers did not obtain, the lawful rights to share the content of tax-related communications with tax-preparer or financial services providers related to tax filings or sensitive financial information.

148.    Any purported consent that Facebook received from Facebook Partner Financial Data Providers was not valid.

149.    In sending and in acquiring the content of tax-related communications with tax-preparer or financial services providers related to tax filings or sensitive financial information, Defendant had a purpose that was tortious, criminal, and designed to violate federal and state legal and constitutional provisions including:

        a.    A knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person;

        b.    A violation of 42 U.S.C. § 1320d-6, which is a criminal offensive punishable by fine or imprisonment;

        c.    Violation of state unfair business practice statutes;

        d.    Violation of the laws and regulations prohibiting disclosure of tax return information cited previously; and

        e.    Violation of Article I, section 1 of the California Constitution.

150.    Defendant knew that such conduct would be highly offensive, as evidenced by Facebook's announcement in April 2018, that it would no longer allow advertising targeted based on finances yet continued to use the Facebook Pixel on Facebook Partner Financial Data Providers' properties for that purpose.

## FIFTH CAUSE OF ACTION

## THE FEDERAL WIRETAP ACT

### (18 U.S.C. §§ 2510, 2512)

151.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

152.    Plaintiffs bring this claim individually and on behalf of Class members against Facebook.

153.    The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, prohibits the intentional interception of the contents of any wire, oral, or electronic communications through the use of a device. 18 U.S.C. § 2511.

154.    The Wiretap Act protects both the sending and receiving of communications.

155.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral or electronic communication is intercepted.

156.    Facebook's actions in intercepting and tracking the information at issue here was intentional and done for the purpose of violating laws prohibiting the unlawful disclosure and review of tax information.

157.    Facebook's intentional interception of internet communications that Plaintiffs and Class members were sending and receiving while navigating websites that integrated the Facebook's Pixel Tool was done contemporaneously with the Plaintiffs' and Class members' sending and receipt of those communications.

158.    The communications intercepted by Facebook included "contents" of electronic communications made from Plaintiffs.

159.    The transmission of data between Plaintiffs and Class members and Facebook were "transfer[s] of signs, signals, writing, ... data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetics, photoelectronic, or photooptical system that affects interstate commerce[,]" and were therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

160.    Facebook's Pixel Tool is an "electronic, mechanical, or other device" as defined by 18 U.S.C. § 2510(5) and is primarily useful for the purpose of the surreptitious interception of electronic communications.

161.    Facebook was not an authorized party to the communications because Plaintiffs and Class members were unaware of Facebook's monitoring. Class members did not consent to Facebook's interception or continued gathering of user communications.

162.    Facebook's interception was unlawful and tortious and was done in furtherance of one or more crimes barring disclosure or review of confidential tax information, and tortious invasion of privacy.

163.    After intercepting the communications, Facebook used the contents of the communications knowing or having reason to know that such information was obtained through the interception of electronic communications in violation of 18 U.S.C. § 2511(a).

164.    18 U.S.C. § 2512, in pertinent part, holds "any person" liable who manufactures, assembles, or sells "any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications, and that such device or any component thereof has been or will be sent through the mail or transported in interstate or foreign commerce." 18 U.S.C. § 2512(1)(b).

165.    Defendant manufactured, marketed, and sold its technology with knowledge that it would primarily be used to illegally intercept electronic communications.

166.    Defendant's conduct violated 18 U.S.C. § 2512 and therefore gives rise to a claim under 18 U.S.C. § 2520, under which Plaintiffs and Class Members are entitled to the greater of

actual damages or statutory damages of not less than $100 a day for each day of violation or $10,000, whichever is greater.

167.    Plaintiffs seek all available relief for the violations asserted here.

### SIXTH CAUSE OF ACTION

### THE CALIFORNIA INVASION OF PRIVACY ACT

### (Cal. Penal Code §§ 631 and 632)

168.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

169.    The California Invasion of Privacy Act (CIPA) is codified at Cal. Penal Code §§ 630-638. The Act begins with its statement of purpose: "The legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

170.    Cal. Penal Code § 631(a) provides, in pertinent part: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner .... willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars."

171.    Cal. Penal Code § 632 provides, in pertinent part, that it is unlawful for any person "intentionally and without the consent of all parties to a confidential communication," to "use[] [a] recording device to ... record the confidential communication." As used in the statute, a "confidential

communication" is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desired it to be confined to the parties thereto[.]"

172.    Facebook is a "person" within the meaning of CIPA §§ 631 and 632.

173.    Facebook did not have the consent of all parties to learn the contents of or record the confidential communications at issue.

174.    Facebook is headquartered in California, designed and contrived and effectuated its scheme to track the communication at issue here from California, and has adopted California substantive law to govern its relationship with users.

175.    At all relevant times, Facebook's conduct alleged herein was without the authorization and consent of the Plaintiffs and Class Members.

176.    Facebook's actions were designed to learn or attempt to learn the meaning of the communications exchanged by its users with their financial services and tax-preparation providers.

177.    Facebook's learning of or attempt to learn the contents of sensitive financial communications occurred while they were in transit or in the process of being sent or received.

## SEVENTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

178.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

179.    Facebook represented to Plaintiffs and the Class members that a fact was true, namely, that before receiving the confidential information at issue, Facebook "requires" businesses "to have lawful rights to collect, use, and share [Plaintiffs' and Class members'] data before providing any data" to Facebook.

180.    Facebook Partner Financial Data Providers represented to Plaintiffs and Class members Class that a fact was true, namely that they would not disclose the confidential information at issue for any reason or use not specifically listed in its Privacy Policies without obtaining Plaintiffs' and Class members' consents.

181.    Defendant's representations were not true.

CLASS ACTION COMPLAINT

182.    Although Defendant may have honestly believed that its representations were true, Defendant had no reasonable grounds for believing its representations were true when they were made.

183.    Defendant intended that Plaintiffs and Class members rely on its representations.

184.    Plaintiffs and Class members reasonably relied on Defendant's representations.

185.    Plaintiffs and Class members were harmed as set forth above.

186.    Plaintiffs and Class members' reliance on Defendant's representations was a substantial factor in causing the harm.

## EIGHTH CAUSE OF ACTION

## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW

### (Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

187.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

188.    California Business and Professions Code section 17200 ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . .."

189.    Facebook has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

190.    Defendant has engaged in unlawful acts or practices under section 17200 by its violations of the California Constitution's right to privacy, ECPA and California Penal Code sections 631 and 632, through the acts and practices set forth in this Complaint.

191.    Defendant has engaged in fraudulent business acts or practices under section 17200 because its misrepresentations and omissions regarding its requirement that businesses have lawful rights to collect, use, and share Plaintiffs' and Class Members' data before providing any data to Defendant, and Defendant's receipt of the confidential information at issue, were intended to, were likely to, and did deceive reasonable consumers such as Plaintiffs and the Class. The information Defendant misrepresented and concealed would be, and is, material to reasonable consumers because Defendant does not require businesses to have lawful rights to collect, use, and share Plaintiffs' and

Class members' data before providing any data to Defendant and Defendant receives the confidential information at issue nonetheless.

192.    Defendant has engaged in unfair acts and practices under section 17200 based on the acts and practices alleged herein, namely, that Defendant claims that it requires businesses to "have lawful rights to collect, use, and share [Plaintiffs' and Class Members'] data before providing any data" to Defendant, but in reality knows (or should have known) that the Facebook Pixel is being improperly used on tax preparation websites resulting in the wrongful, contemporaneous, redirection to Facebook of sensitive financial communications without the knowledge or authorization of Plaintiffs or Class Members.

193.    Facebook's actions offend public policy.

194.    Facebook's conduct, misrepresentations and omissions have also impaired competition within the tax-preparation and financial services market in that those actions have prevented Plaintiffs and Class members from making fully informed decisions about whether to communicate online with their financial services providers and to use their providers' websites in the first instance.

195.    Plaintiffs and Class members have suffered an injury in fact, including the loss of money and/or property, as a result of Defendant's unfair, unlawful and/or deceptive practices, to wit, the disclosure of their personally identifiable data which has value as is demonstrated by the use and sale of it by Defendant. While only an identifiable "trifle" of injury is needed to be shown, as set forth above, Plaintiffs, the Class members, and the public at large value their sensitive financial information at more than a trifle. And sale of this confidential and valuable information has now diminished the value of such information to Plaintiffs and the Class.

196.    Facebook's actions caused damage to and loss of Plaintiffs', Class members' and other taxpayers' property right to control the dissemination and use of their personally identifiable financial and tax data and communications.

197.    Defendant's actions caused damage to and loss of Plaintiffs', Class members' and other taxpayers' property rights to control the dissemination and use of the personally identifiable communications.

198.    Facebook's representation that it requires businesses to "have lawful rights to collect, use, and share [Plaintiffs' and Class members'] data before providing any data" to Defendant was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used their tax preparer's or financial services provider's website, or would have paid less for the services rendered.

199.    The wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Facebook's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, in the State of California.

200.    Plaintiffs and the Class request that this Court enjoin Defendant from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the Class, in the form of restitution, any money Defendant acquired through its unfair competition.

## NINTH CAUSE OF ACTION

## VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT

### (815 ILCS §§ 505, *et seq.*)

201.    Plaintiffs re-allege and incorporate all of the allegations contained in the preceding paragraphs.

202.    This claim is brought under the laws of Illinois and on behalf of Plaintiffs Craig and Bryant and all other natural persons who were defrauded by Facebook and reside in states having similar laws regarding consumer fraud.

203.    Defendant is a "person" as defined by 815 Ill. Comp. Stat. §§ 505/1(c).

204.    Plaintiffs and Class members are "consumers" as defined by 815 Ill. Comp. Stat. §§ 505/1(e).

205.    Defendant's conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 Ill. Comp. Stat. § 505/1(f).

206.    Defendant's fraudulent business practices, in violation of 815 Ill. Comp. Stat. § 505/2, include the acts and practices alleged herein and throughout the Complaint, namely, that Defendant claims that it requires businesses to "have lawful rights to collect, use, and share [Plaintiffs' and Class members'] data before providing any data" to Defendant, but in reality knows

(or should have known) that the Facebook Pixel is being improperly used on tax preparation websites resulting in the wrongful, contemporaneous, redirection to Facebook of sensitive financial communications without the knowledge or authorization of Plaintiffs or Class members.

207. Facebook also failed to protect and misrepresented that it would protect the privacy and confidentiality of Plaintiffs and Class members' sensitive financial information used in tax preparation, including by implementing and maintaining reasonable security measures that would have prevented Facebook Partner Financial Data Providers from sharing that information or using it with the Facebook Pixel.

208. Plaintiffs and Class members have suffered an injury in fact, including the loss of money and/or property, as a result of Defendant's unfair, unlawful and/or deceptive practices, to wit, the disclosure of their personally identifiable data which has value as is demonstrated by the use and sale of it by Defendant. While only an identifiable "trifle" of injury is needed to be shown, as set forth above Plaintiffs, the Class members, and the public at large value their sensitive financial information at more than a trifle. And sale of this confidential and valuable information to has now diminished the value of such information to Plaintiffs and the Class.

209. Defendant's actions caused damage to and loss of Plaintiffs', Class members' and other taxpayers' property rights to control the dissemination and use of the personally identifiable communications.

210. Defendant's representations and omissions were material. Defendant's misrepresentations and omissions regarding its requirement that businesses have lawful rights to collect, use, and share Plaintiffs' and Class Members' data before providing any data to Defendant, and Defendant's receipt of the confidential information at issue, were intended to, were likely to, and did deceive reasonable consumers such as Plaintiffs and the Class. The information Defendant misrepresented and concealed would be, and is, material to reasonable consumers because Defendant does not require businesses to have lawful rights to collect, use, and share Plaintiffs' and Class members' data before providing any data to Defendant and Defendant receives the confidential information at issue nonetheless.

211.   Defendant intended to mislead its customers, Plaintiffs, and Class members, and induce them to rely on its misrepresentations and omissions.

212.   The above unfair and deceptive practices and acts by Defendant offend public policy. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

213.   Defendant acted intentionally and knowingly to violate Illinois' Consumer Fraud Act, and recklessly disregarded Plaintiffs' and Class members' rights.

214.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to, nominal damages; general damages based on the fact that their sensitive and confidential information including financial and personal information that Plaintiffs and Class members intended to remain private are no longer private; that Facebook eroded the essential confidential nature of the filer-tax preparer relationship; that Facebook took something of value from Plaintiffs and Class members and derived benefits therefrom without Plaintiffs' and Class members' knowledge or informed consent and without sharing the benefit of such value; and, the diminished value of Defendant's goods and services Plaintiffs and Class members received.

215.   Plaintiffs and Class members seek all monetary and non–monetary relief allowed by law, including damages, restitution, nominal and punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## TENTH CAUSE OF ACTION

## VIOLATION OF THE ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT

### (815 ILCS §§ 510/2, *et seq.*)

216.   Plaintiffs re-allege and incorporate all of the allegations contained in the preceding paragraphs.

217.   This claim is brought under the laws of Illinois and on behalf of Plaintiffs Craig and Bryant and all other natural persons who were defrauded by Facebook and reside in states having similar laws regarding deceptive trade practices.

218.    Defendant is a "person" as defined by 815 Ill. Comp. Stat. §§ 510/1(5).

219.    Defendant engaged in deceptive trade practices in the conduct of its business, in violation of 815 Ill. Comp. Stat. §§ 510/2(a), including the acts and practices alleged herein, namely, that Defendant claims that it requires businesses to "have lawful rights to collect, use, and share [Plaintiffs' and Class members'] data before providing any data" to Defendant, but in reality knows (or should have known) that the Facebook Pixel is being improperly used on tax preparation websites resulting in the wrongful, contemporaneous, redirection to Facebook of sensitive financial communications without the knowledge or authorization of Plaintiffs or Class members.

220.    This is a deceptive trade practice because it is a mechanism for: (a) Representing that goods or services have characteristics that they do not have; (b) Representing that goods or services are of a particular standard, quality, or grade if they are of another; (c) Advertising goods or services with intent not to sell them as advertised; and (d) Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

221.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of Plaintiffs' and Class members' PII.

222.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers, including Plaintiffs and Class members.

223.    The above unfair and deceptive practices and acts by Defendant offend and violate public policy. These acts caused substantial injury to Plaintiffs and Class members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

224.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to, nominal damages; general damages based on the fact that their sensitive and confidential information including financial and personal information that Plaintiffs and Class members intended to remain private are no longer private; that Facebook eroded the essential confidential nature of the filer-tax preparer relationship; that Facebook took something of value from Plaintiffs and Class members and derived benefits therefrom without Plaintiffs' and Class members' knowledge or informed consent and

1  without sharing the benefit of such value; and, the diminished value of Defendant's goods and

2  services Plaintiffs and Class members received.

3       225.  Plaintiffs and Class members seek all monetary and non–monetary relief allowed by

4  law, including damages, restitution, nominal and punitive damages, injunctive relief, and reasonable

5  attorneys' fees and costs.

6  <div align="center">**ELEVENTH CAUSE OF ACTION**</div>

7  <div align="center">**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW**</div>

8  <div align="center">**(N.Y. Gen. Bus. Law § 349 ("GBL"))**</div>

9       226.  Plaintiffs reallege and incorporate all previous allegations as though fully set forth

10  herein.

11       227.  This claim is brought under the laws of New York  and on behalf of Plaintiff

12  Kurmangaliyev and all other natural persons who were defrauded by Facebook and reside in states

13  having similar laws regarding deceptive trade practices.

14       228.  Section 349 of the New York GBL provides that "[d]eceptive acts or practices in the

15  conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby

16  declared unlawful." N.Y. Gen. Bus. Law § 349(a).

17       229.  Defendant, while operating in New York, engaged in deceptive acts and practices in

18  the conduct of business, trade and commerce, and the furnishing of services, in violation of N.Y.

19  Gen. Bus. Law § 349(a). This includes but is not limited to the following: disclosing Plaintiffs' and

20  Class members' sensitive financial information; knowingly and fraudulently providing Plaintiffs'

21  and Class members' sensitive financial information through use of the Facebook Pixel tool;

22  knowingly and fraudulently misrepresenting that Defendant would comply with the requirements of

23  relevant federal and state laws pertaining to the disclosure of tax information and tax records; and

24  claiming that  it requires businesses to "have lawful rights to collect, use, and share [Plaintiffs' and

25  Class members'] data before providing any data" to Defendant, while in reality it knew (or should

26  have known) that the Facebook Pixel is being improperly used on tax preparation websites resulting

27  in the wrongful, contemporaneous, redirection to Facebook of sensitive financial communications

28  without the knowledge or authorization of Plaintiffs or Class members.

230.    As a direct and proximate result of Defendant's practices, Plaintiffs and other Class members suffered injury and/or damages, including but not limited to, nominal damages; general damages based on the fact that their sensitive and confidential information including financial and personal information that Plaintiffs and Class members intended to remain private are no longer private; that Facebook eroded the essential confidential nature of the filer-tax preparer relationship; that Facebook took something of value from Plaintiffs and Class members and derived benefits therefrom without Plaintiffs' and Class members' knowledge or informed consent and without sharing the benefit of such value; and, the diminished value of Defendant's goods and services Plaintiffs and Class members received.

231.    The above unfair and deceptive practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and other Class members that they could not reasonably avoid, and which outweighed any benefits to consumers or to competition.

232.    Plaintiffs and Class members seek relief under N.Y. Gen. Bus. Law § 349(h), including but not limited to actual damages (to be proven at trial), treble damages, statutory damages, injunctive relief, and/or attorney's fees and costs.

233.    Plaintiffs and Class members seek to enjoin such unlawful deceptive acts and practices described above. Each Class member will be irreparably harmed unless the Court enjoins Defendant's unlawful, deceptive actions, in that Defendant will continue to engage in the unlawful conduct outlined above unless enjoined from doing so.

234.    Plaintiffs and Class members seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief prohibiting Defendant from continuing to disseminate its false and misleading statements, and other relief allowable under N.Y. Gen. Bus. Law § 349.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

a.    Certify the proposed Class, designating Plaintiffs as the named representatives of the Class, and designating the undersigned as Class Counsel;

b.      Award compensatory damages, including statutory damages where available, to Plaintiffs and the Class against Defendant for all damages sustained by Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

c.      Award punitive damages on the causes of action that allow for them and in an amount that will deter Defendant and others from like conduct;

d.      Award attorneys' fees and costs, as allowed by law including, but not limited to, California Code of Civil Procedure section 1021.5;

e.      Award pre-judgment and post-judgment interest, as provided by law; and,

f.      For such other, further, and different relief as the Court deems proper under the circumstances.

## REQUEST FOR A JURY TRIAL

Plaintiffs request a trial by jury of all issues so triable.

## NOTICE TO THE ILLINOIS ATTORNEY GENERAL

A copy of this Complaint will be mailed to the Illinois Attorney General.

Dated:  January 23, 2023

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**

*s/ Rebecca A. Peterson*
Robert K. Shelquist*
Rebecca A. Peterson (241858)
Kate M. Baxter-Kauf*
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
rkshelquist@locklaw.com
rapeterson@locklaw.com
kmbaxter-kauf@locklaw.com

Lori G. Feldman*
**GEORGE GESTEN MCDONALD, PLLC**
200 Park Avenue, Suite 1700
New York, New York 10166
Telephone: (646) 354-6534
lfeldman@4-justice.com

CLASS ACTION COMPLAINT

David J. George*
Brittany Brown*
**GEORGE GESTEN MCDONALD, PLLC**
9897 Lake Worth Road, Suite 302
Lake Worth, FL 33467
Telephone: (561) 232-6002
dgeorge@4-justice.com
bbrown@4-justice.com

***Attorneys for Plaintiff***

*motion for admission *pro hac vice*
forthcoming

CLASS ACTION COMPLAINT